**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TYRIK VERNON,** | : | **Civil No. 1:13-CV-1497** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **CHARLES CUSTER, et al.,** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM**

## I.   INTRODUCTION

Tyrik Vernon is an inmate in the custody of the Pennsylvania Department of Corrections, currently incarcerated at the State Correctional Institution at Greene. Vernon has previously lodged three different, legally flawed complaints with this court. (Docs. 1,10, and 20.) In each instance we have been compelled to dismiss these complaint. We have, however, provided Vernon with leave to amend his pleadings on multiple occasions in order to afford him every opportunity to state a claim.

In this action, the latest iteration of this lawsuit Vernon now files a fourth complaint (Doc. 38), which brings claims against a number of supervisory officials within the Department of Corrections, as well as a number of employees at SCI-Coal Township, where Vernon was housed before his transfer to SCI-Greene in the spring of 2013. Many of these claims mirror or closely parallel claims that we have

previously found to be wanting.  Thus, Vernon brings claims against the defendants

for alleged violations of his right to procedural due process in connection with certain

disciplinary proceedings that were brought against him in Fall of 2012.  In addition,

Vernon claims that the defendants retaliated against him for engaging in activities

protected by the First Amendment, specifically for filing grievances challenging the

actions of the disciplinary hearing officer who issued an adverse ruling in the

disciplinary proceedings.  Finally, Vernon claims that some of the defendants

committed intentional torts against him in violation of federal law, in connection with

his disciplinary proceedings.

        The defendants have moved to dismiss this, Vernon's latest amended

complaint.  (Doc. 42.)  The motion is fully briefed and is ripe for disposition.  For the

reasons that follow, the motion will be granted, and the complaint will be dismissed.

## II.    <u>BACKGROUND</u>

        The background of this memorandum is taken chiefly from the well pleaded

allegations set forth in Vernon's latest amended complaint (Doc. 38), which are in

large measure substantially similar to those allegations in Vernon's prior amended

complaint (Doc. 20), a complaint we previously found was inadequate to state a claim

(Docs. 34, 35).[1]

In September 2012, Vernon was housed at SCI-Coal Township.   Vernon claims that sometime during this month, he began experiencing problems with a Lieutenant Shipe at that institution, who warned Vernon that if he did not provide information about inmates that Lieutenant Shipe believed were smuggling drugs and contraband into the institution, "he would personally see to it that [Vernon] would not get another visit in that institution or any where else, from [his] wife."  (Doc. 38, ¶ 22.)  Nevertheless, Vernon alleges that he had no such information and therefore provided none, notwithstanding Lieutenant Shipe's threat.  (Id.)

On September 18, 2012, Vernon clams that he submitted a Request to Staff form to Superintendent David Varano.  It appears that when Vernon submitted this form, he had been held in restricted or administrative housing since September 2, 2012, pending an investigation into allegations that Vernon was receiving contraband from prison visitors, including his wife.  It appears that these charges were filed by Lieutenant Shipe.   Vernon submitted the request to Varano to inform the

---

[1] To the extent Vernon's amended complaint includes allegations of conduct that occurred at SCI-Greene in 2013, we have already ruled that Vernon would not be permitted to include these proposed supplemental claims since they allegedly occurred outside of this district.  (Docs. 50, 51.)  Accordingly, the background to this memorandum is limited to matters that Vernon claims occurred during his incarceration at SCI-Coal Township until he was transferred to SCI-Greene in March 2013.

Superintendent that Vernon had been held in administrative custody for more than 15

days, while the investigation unfolded, and Vernon believed that under Department

of Corrections' written policies, he was required to be released back into the general

population of the prison following this brief investigative period.

However, at approximately 10:30 p.m. on September 18, 2012, Vernon

received a DC-141 form that advised him that the prison was extending its

investigation, and that he would be held in administrative custody for an additional

15 days.  On September 20, 2012, Superintendent Varano responded to Vernon's

request, stating that he understood Vernon was going to be held for an additional 15

days, and that Vernon had received adequate notice of this decision.  (Doc. 20, ¶¶ 17-

20; Doc. 38, ¶¶ 12-15.)

Also on September 20, Vernon met with members of the Program Review

Committee (PRC), which was comprised of Defendants Linda Chesmar, George

Miller, and Deputy Luscavage.  During this meeting, Vernon argued that he was

being held in administrative custody unlawfully or in violation of Corrections' policy,

but was told that he was not going to be released on a technicality while the

investigation into the charges continued.  (Doc. 20, ¶¶ 21-23; Doc. 38, ¶¶ 16-17.)

On September 29, 2012, Vernon received a DC-141 misconduct report

prepared by Lieutenant Shipe alleging that Vernon had engaged in an unlawful

criminal conspiracy to possess a telecommunications device, as well as for violations of other unspecified Department of Corrections policies.  (Doc. 20, ¶ 25; Doc. 38, ¶ 18.)  The following day, Vernon submitted a DC-141 part 2A form, which is the form that inmates who are charged with misconduct may use to request representation and witnesses at their misconduct proceedings.  Vernon requested that the disciplinary hearing officer review video surveillance and phone recordings as exculpatory evidence.  (Doc. 20, ¶¶ 26-27; Doc. 38, ¶19.)

Notwithstanding his request, on October 4, 2012, Vernon was taken to his disciplinary hearing before the hearing examiner, Defendant Lisa Kerns-Barr, who declined his request for the presentment of exculpatory evidence, and did not review any other unidentified evidence that Vernon claims he provided. (Doc. 20, ¶ 28; Doc. 38, ¶ 20.)  At this hearing, Vernon claims that Defendant Kerns-Barr threatened that she would find Vernon guilty of the misconduct if he refused to sign a waiver.  (Doc. 38, ¶ 21.)

On October 23, 2012, Vernon was taken to his misconduct hearing, where he learned that Defendant Kerns-Barr still had not reviewed exculpatory evidence that Vernon wished her to consider.  (Doc. 38, ¶ 23.)  Instead, the hearing examiner rejected Vernon's request for the charges to be dismissed on the basis of her alleged violations of his due process rights, and instead took testimony from Lieutenant

Shipe, the reporting officer who filed the misconduct against Vernon in the first place.  (Id.)  It appears that following this hearing, the hearing examiner found Vernon guilty of the charged misconduct, and Vernon filed an appeal of the decision, asserting that he did not receive due process.

On October 28, 2012, Vernon wrote to the Secretary of the Department of Corrections, John Wetzel and defendant Robin Lewis to complain about the misconduct he had been issued and the process that he received, but Wetzel declined to respond, and Lewis merely acknowledged receipt of Vernon's letter.  (Doc. 20, ¶ 38; Doc. 38, ¶¶ 27-28.)  On November 7, 2012, the appeal board upheld Defendant Kerns-Barr's decision in a ruling that Vernon claims was "untimely." (Doc. 38, ¶ 26.) On November 5, 2012, Superintendent Varano sanctioned Vernon for the misconduct conviction by indefinitely suspending visitation between Vernon and his wife. (Doc. 20, ¶ 39; Doc. 38, ¶ 30.)

Vernon continued his efforts to challenge what he perceived to be due process violations in connection with his disciplinary proceedings.  To this end, Vernon filed grievances with Department of Corrections officials, including defendants Lewis and Wetzel, but he did not obtain any relief, and he claims these officials failed to investigate his claims.  (Doc. 20, ¶¶ 40-41, 50-60; Doc. 38, ¶ 32-33.)

Vernon claims that in early 2013 he was subjected to various indignities, sexual

harassment, and improper treatment by prison staff in early 2013, which Vernon

challenged unsuccessfully through the prison grievance process. (Doc. 38, ¶¶ 42-51.)

March 7, 2013, Vernon was summoned to another PRC hearing where he was

addressed by defendants Luscavage and Miller.  (Id. ¶ 52.)  During this meeting,

Vernon was informed that due to filing bogus grievances, he was being transferred

to SCI-Greene, and was urged to discontinue filing baseless grievances and to assist

corrections officers by providing information about other inmates.  (Id. ¶¶ 55-62.)

Vernon was transferred to SCI-Greene on March 12, 2013.[2]

## III.   STANDARD OF REVIEW

With respect to this benchmark standard for legal sufficiency of a complaint,

the United States Court of Appeals for the Third Circuit has aptly noted the evolving

standards governing pleading practice in federal court, stating that:

> Standards of pleading have been in the forefront of jurisprudence in
> recent years. Beginning with the Supreme Court's opinion in Bell
> Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) continuing with our
> opinion in Phillips [v. County of Allegheny, 515 F.3d 224, 230 (3d Cir.
> 2008)]and culminating recently with the Supreme Court's decision in
> Ashcroft v. Iqbal  –U.S.–, 129 S.Ct. 1937 (2009) pleading standards

---

[2] As noted, the remainder of Vernon's amended complaint involves conduct
that allegedly occurred exclusively in the Western District of Pennsylvania.  We
have previously denied Vernon's request for permission to supplement his
complaint to include these allegations, since they are plainly not properly included
as part of this lawsuit. (Docs. 50, 51.)  Accordingly, we decline to summarize
these factual allegations and related claims further in this memorandum.

> have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss.

Fowler v. UPMC Shadyside, 578 F.3d 203, 209-10 (3d Cir. 2009).

In considering whether a complaint fails to state a claim upon which relief may be granted, the Court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn from the complaint are to be construed in the light most favorable to the plaintiff.  Jordan v. Fox Rothschild, O'Brien & Frankel, Inc., 20 F.3d 1250, 1261 (3d Cir. 1994).  However, a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).  Additionally a court need not "assume that a ... plaintiff can prove facts that the ... plaintiff has not alleged."  Associated Gen. Contractors of Cal. v. California State Council of Carpenters, 459 U.S. 519, 526 (1983). As the Supreme Court held in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), in order to state a valid cause of action a plaintiff must provide some factual grounds for relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do."  Id. at 555.  "Factual allegations must be enough to raise a right to relief above the speculative level."  Id.

In keeping with the principles of Twombly, the Supreme Court has underscored

8

that a trial court must assess whether a complaint states facts upon which relief can be granted when ruling on a motion to dismiss. In <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009), the Supreme Court held that, when considering a motion to dismiss, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." <u>Id.</u> at 679. According to the Supreme Court, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> at 678. Rather, in conducting a review of the adequacy of complaint, the Supreme Court has advised trial courts that they must:

> [B]egin by identifying pleadings that because they are no more than conclusions are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

<u>Id.</u> at 679.

Thus, following <u>Twombly</u> and <u>Iqbal</u> a well-pleaded complaint must contain more than mere legal labels and conclusions. Rather, a complaint must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation. As the United States Court of Appeals for the Third Circuit has stated:

> [A]fter Iqbal, when presented with a motion to dismiss for failure to
> state a claim, district courts should conduct a two-part analysis. First, the
> factual and legal elements of a claim should be separated. The District
> Court must accept all of the complaint's well-pleaded facts as true, but
> may disregard any legal conclusions. Second, a District Court must
> then determine whether the facts alleged in the complaint are sufficient
> to show that the plaintiff has a "plausible claim for relief." In other
> words, a complaint must do more than allege the plaintiff's entitlement
> to relief. A complaint has to "show" such an entitlement with its facts.

Fowler, 578 F.3d at 210-11.

In practice, consideration of the legal sufficiency of a complaint entails a

three-step analysis: "First, the court must 'tak[e] note of the elements a plaintiff must

plead to state a claim.' Iqbal, 129 S.Ct. at 1947. Second, the court should identify

allegations that, 'because they are no more than conclusions, are not entitled to the

assumption of truth.' Id. at 1950. Finally, 'where there are well-pleaded factual

allegations, a court should assume their veracity and then determine whether they

plausibly give rise to an entitlement for relief.' Id." Santiago v. Warminster Tp., 629

F.3d 121, 130 (3d Cir. 2010).

## IV.   DISCUSSION

### A.   Vernon's Due Process Claims Fail as a Matter of Law

Vernon has alleged a string of due process violations stemming from his

charged misconduct, his initial disciplinary custody while these charges were

investigated, the hearing examiner's refusal to consider exculpatory evidence during

10

his proceedings, and the adverse rulings on the misconduct and the appeals that followed.  However, no matter how Vernon frames his claims, he is unable to state a claim for due process upon which relief can be granted in this case.

The Fourteenth Amendment to the United States Constitution provides, in pertinent part, as follows: "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."  In the case of procedural due process, which is implicated in Vernon's claims, the Supreme Court has enunciated a two-part analysis to determine the adequacy of the claims: (1) "whether the asserted individual interests are encompassed within the . . . protection of 'life, liberty or property[,]" and (2) "if protected interests are implicated, we then must decide what procedures constitute 'due process of law.' " Ingraham v. Wright, 430 U.S. 651, 672 (1977); see also Shoats v. Horn, 213 F.3d 140, 143 (2000).  Protected liberty or property interests generally arise either from the Due Process Clause or from state-created statutory entitlement. See Board of Regents v. Roth, 408 U.S. 564, 575 (1972).  If there is no protected liberty or property interest at issue, it is unnecessary to consider the procedures that were followed when an alleged deprivation of an interest occurred. Brown v. Hanna, 850 F. Supp. 2d 471, 476 (M.D. Pa. 2012).

In the case of prison inmates, the court's due process inquiry is grounded in consideration of whether the state action resulted in an "atypical and significant

hardship" on the plaintiff-inmate:

> [i]n <u>Sandin v. Conner</u>, the Supreme Court announced a new standard for determining whether prison conditions deprive a prisoner of a liberty interest that is protected by procedural due process guarantees. Although the Court acknowledged that liberty interests could arise from means other than the Due Process Clause itself, the Court concluded that state-created liberty interests could arise only when a prison's action imposed an '*atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.*' . . . In finding that the prisoner's thirty-day confinement in disciplinary custody did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest, the Court considered the following two factors: 1) the amount of time the prisoner was placed into disciplinary segregation; and 2) whether the conditions of his confinement in disciplinary segregation were significantly more restrictive than those imposed upon other inmates in solitary confinement.

<u>Shoats</u>, 213 F.3d at 143-44(citations omitted) (emphasis added).  In deciding whether a protected liberty interest exists following <u>Sandin</u>, courts consider the duration of the confinement and the conditions of that confinement in relation to other prison conditions.  <u>Mitchell v. Horn</u>, 318 F.3d 523, 532 (3d Cir. 2003).  Whether a protected liberty interest exists under <u>Sandin</u> thus requires inquiry into the specific facts alleged in each case.  <u>Id.</u> at 533.

In this case, Vernon claims that he brief detention in administrative custody while officials at SCI-Coal Township conducted an investigation into the serious charges against him constituted a deprivation of his right to due process. Additionally, he believes that process was flawed throughout his disciplinary

12

proceedings and appeals, and he takes issue with receiving five days of segregation at SCI-Greene, the fact that he was transferred some distance from his family, and that he has been deprived of visitation with his spouse. However, the case law in this field makes clear that none of these claims are sufficient to allege that Vernon was subjected to "atypical and significant hardship" necessary to support a due process claim.

As a threshold matter, the fact that Vernon was held in administrative or disciplinary custody for a period of a few weeks or even months during his disciplinary proceedings at SCI-Coal Township does not present an atypical or significant hardship. See Smith v. Mensingner, 293 F.3d 641, 654 (3d Cir. 2002) (holding that seven months of disciplinary confinement was not an atypical and significant hardship); Griffin v. Vaughn, 112 F.3d 703, 706 (3d Cir. 1997) (placement of prisoner in administrative custody for 15 months did not involve an atypical, significant deprivation).

This result is not altered if we consider Vernon's vague assertions that the Department of Corrections may have failed to follow its own internal regulations regarding periods of administrative custody during investigations into misconduct. See Wilkinson v. Austin, 545 U.S. 209, 223 (2005) ("After Sandin, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty

interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.' ")

Likewise, Vernon's transfer to SCI-Greene does not present a due process issue, since the Supreme Court has made clear that inmates have no liberty interest in being confined at any particular prison. See Olim v. Wakinekona, 461 U.S. 238, 245-46 (1983). Moreover, it is "well established that the decision where to house inmates is at the core of prison administrators' expertise." McKune v. Lile, 536 U.S. 24, 39 (2002). Thus, although Vernon's transfer no doubt imposed some hardship on him and on them, this transfer in itself does not implicate due process concerns.

The result is no different with respect to Vernon's complaints that he has been denied visitation with his wife for an extended period. Setting aside the fact that the amended complaint suggests that Vernon was found guilty of receiving contraband from visitors, including his wife, the suspension of visitation privileges does not trigger due process consideration. It is axiomatic that inmates do not retain rights that are found to be incompatible with their incarceration, and "freedom of association is among the rights least compatible with incarceration." Overton v. Bazzetta, 539 U.S. 126, 131 (2003). Accordingly, "some curtailment of that freedom must be expected in the prison context." Id. "The denial of prison access to a particular visitor 'is well

within the terms of confinement ordinarily contemplated by a prison sentence,' . . . and therefore is not independently protected by the Due Process Clause." <u>Kentucky Dep't of Corr. v. Thompson</u>, 490 U.S. 454, 460 (1989) (quoting <u>Hewitt v. Helms</u>, 459 U.S. 460, 468 (1983)).  Accordingly, Vernon's loss of visiting privileges with his wife for even an indefinite amount of time does not at this time present an atypical and significant hardship in relation to the ordinary incidents of prison life for purposes of due process.  <u>See, e.g.</u>, <u>Ware v. Morrison</u>, 276 F.3d 385, 387 (8th Cir. 2002) (holding 18-month suspension of prisoner's visiting privileges with his wife and two other individuals did not impose an atypical and significant hardship).

As the foregoing case law makes clear, no matter how Vernon frames his due process claims, they fail because he has not alleged facts to show that he suffered atypical and significant hardships in relation to the ordinary incidents of prison life with respect to his detention in administrative and disciplinary custody, or in connection with his disciplinary proceedings, or in the sanctions that he received.

### B.      Vernon's Retaliation Claims Also Fail

Vernon claims that the defendants retaliated against him after he persisted in seeking recourse for the alleged unlawful conduct of defendants Shipe and Kerns-Barr in connection with the issuance of a misconduct, and defendant Kerns-Barr's handling of his misconduct proceedings.  In his earlier complaint (Doc. 20), Vernon

alleged that he was transferred from SCI-Coal Township to SCI-Greene, and denied visitation privileges with his wife, in retaliation for filing grievances and seeking redress for what he perceived to have been malfeasance by defendants Shipe and Kerns-Barr.  In the latest iteration of his complaint, Vernon seems to have altered his theory of retaliation, and now claims that Shipe issued him a misconduct in retaliation for Vernon's refusal to provide information about other inmates.  Regardless of Vernon's theory of retaliation, he has failed to allege an actionable claim.

In order to make out a claim for First Amendment retaliation, a plaintiff must show that (1) "the conduct which led to the alleged retaliation [is] constitutionally protected"; (2) "he suffered some adverse action at the hands of prison officials . . . sufficient to deter a person of ordinary firmness from exercising his constitutional rights"; and (3) there is a "causal link between the exercise of his constitutional rights and the adverse action taken against him."  Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001).  Even if a prisoner makes out this showing, however, "prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest."  Id. at 334.

It is undisputed that the filing of inmate grievances constitutes activity protected by the First Amendment.  See Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir.

16

2003). Additionally, the defendants agree with Vernon that prison decisions that subject an inmate to disciplinary custody, <u>Allah v. Seiverling</u>, 229 F.3d 220, 225 (3d Cir. 2000), or that transfer an inmate to a prison at great distance from an inmate's family, <u>Rauser</u>, 241 F.3d at 333, may constitute "adverse action" for First Amendment retaliation purposes. <u>Id.</u> However, although the defendants concede that Vernon has made out the first two steps of a retaliation claim, they maintain that he has nonetheless failed to allege facts to show a *causal relationship* between his constitutionally protected activity, and his eventual transfer to SCI-Greene.

> In order to establish a causal connection for purposes of a retaliation claim,
>
> a plaintiff usually must prove either (1) an unusually suggesting temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. <u>See</u> <u>Krouse v. American Sterilizer Co.</u>, 126 F.3d 494, 503-04 (3d Cir. 1997); <u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913, 920-21 (3d Cir. 1997). In the absence of that proof the plaintiff must show that from the "evidence gleaned from the record as a whole" the trier of fact should infer causation." <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 281 (3d Cir. 2000).

<u>Lauren W. ex rel. Jean W. v. DeFlaminis</u>, 480 F.3d 259, 267 (3d Cir. 2007). Moreover, when examining these causation issues, we are specifically admonished that:

> A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual

capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take. The point we make is not theoretical as we do not doubt that public actors are well aware that persons disappointed with official decisions and actions frequently bring litigation against the actors responsible for the decisions or actions in their individual capacities, and the actors surely would want to avoid such unpleasant events. Thus, it would be natural for a public actor to attempt to head off a putative plaintiff with the unwarranted expenditure of public funds. Courts by their decisions should not encourage such activity and, by enforcing the requirement that a plaintiff show causation in a retaliation case, can avoid doing so as they will protect the public actor from unjustified litigation for his appropriate conduct. In this regard we recognize that often public actors such as those in this case must make a large number of decisions in charged atmospheres thereby inviting litigation against themselves in which plaintiffs ask the courts to second guess the actors' decisions.

Id. at 267-68.

Mindful of these concerns, courts have in the past carefully scrutinized inmate claims of retaliation premised solely on circumstantial proof of a temporal proximity between the plaintiff's conduct and allegedly retaliatory acts. Indeed, this Court has spoken directly to the issue of what must be shown to state a valid complaint in this factual context, noting that:

To establish the causation element of a retaliation claim, a plaintiff must prove that his or her participation in a protected activity motivated the defendant to perform the retaliatory act. Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir.2002); Meenan v. Harrison, Civ. A. No. 3:03-CV-1300, 2006 WL 1000032, at *4 (M.D.Pa. Apr.13, 2006) (observing that a plaintiff must demonstrate that the exercise of First Amendment

18

rights "played some substantial role" in the defendant's action). The temporal proximity of a retaliatory act to a plaintiff's exercise of his or her First Amendment rights is probative, but not dispositive, of the causation element. Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir.2003); see also Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir.1997) (stating that "temporal proximity merely provides an evidentiary basis from which an inference can be drawn"). For temporal proximity alone to establish causation, the "timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." Marasco, 318 F.3d at 512 (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir.1997)). In the employment context, the Third Circuit Court of Appeals has suggested that a temporal proximity of two days is sufficient to establish causation, see Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 & n. 5 (3d Cir.2000), whereas a temporal proximity of ten days is sufficient to establish causation only when accompanied by other evidence of an employer's wrongdoing, Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir.2003). This suggests that the temporal proximity must be measured in days, rather than in weeks or months, to suggest causation without corroborative evidence.

Conklin v. Warrington Tp., No. 06-2245,  2009 WL 1227950, *3 (M.D.Pa. April 30,2009)

Applying this standard, courts in civil rights cases have frequently rebuffed speculative efforts to infer causation from temporal proximity when a span of weeks or months separated the plaintiff's constitutionally protected conduct from the defendants' alleged acts of retaliation. Thus, "[o]ur sister courts have held that a temporal proximity of as little as seventeen days was insufficient to establish causation. See Killen v. N.W. Human Servs., Inc., No. 06-4100, 2007 WL 2684541,

at *8 (E.D.Pa. Sept.7, 2007) (holding that temporal proximity of seventeen days was insufficient to establish causation); see also Farrell, 206 F.3d at 279 n. 6 (suggesting that temporal proximity of seven weeks would be insufficient to establish causation); Smith v. ABF Freight Sys., Inc., No. 04-2231, 2007 WL 3231969, at *11 (M.D.Pa. Oct.29, 2007) (holding that temporal proximity of one and one-half months was insufficient to establish causation); Mar v. City of McKeesport, No. 05-19, 2007 WL 2769718, at *4 (W.D.Pa. Sept.20, 2007) (holding that temporal proximity of three months was insufficient to establish causation)." Fischer v. Transue, 04-2756, 2008 WL 3981521, *10 (M.D.Pa. Aug. 22, 2008)(holding that temporal proximity of three weeks was insufficient to establish causation).

In practice, application of these legal tenets has routinely led to the rejection of retaliation claims as legally insufficient when those claims are like the retaliation assertion made here by Vernon: An assertion of retaliation based solely on circumstantial proof of some temporal link between the plaintiff's conduct and the defendants' actions when, in fact, the evidence shows that these events are separated by months. See, e.g., DeFranco v. Wolfe, No. 08-1957, 2010 WL 2762968 (3d Cir. July 14, 2010)(denying inmate cell transfer retaliation claim, two months temporal proximity insufficient); Bailey v. Commercial National Insurance Co., 267 F.App'x., 167 (3d Cir. 2008)(employment discrimination-retaliation case, four months temporal

proximity insufficient); <u>Richmond v. ONEOK, Inc.</u>, 120 F.3d 205, 209 (10th Cir.1997) (3-month period insufficient); <u>Hughes v. Derwinski</u>, 967 F.2d 1168, 1174-75 (7th Cir.1992) (4-month period insufficient); <u>Conklin v. Warrington Tp.</u>, No. 06-2245, 2009 WL 1227950 (M.D.Pa. April 30, 2009)(two months temporal proximity insufficient); <u>Rogers v. Delaware, Dept. of Public Safety/DMV</u> 541 F.Supp.2d 623, 627 (D.Del. 2008)(10 months insufficient);<u>Brown v. Boeing</u>, 468 F.Supp.2d 729 (E.D.Pa. 2007)(3-4 months insufficient); <u>Lumban-Tobing v. Potter</u>, No. 04-979, 2005 WL 2100691 (M.D. Pa. Aug. 30, 2005)(9 months insufficient temporal proximity, but other proof creates factual issue precluding summary judgment).

In this case, although we are mindful of the deference that we must pay to the facts that Vernon has alleged in the complaint, we nevertheless do not find that the plaintiff has adequately alleged facts sufficient to support a claim for First Amendment retaliation.   As a threshold matter, to the extent that Vernon continues to press his claim that his transfer to SCI-Greene was retaliatory, he has offered nothing to support this speculative assertion, and he previously conceded that the separate decision to prevent Vernon from visitation with his wife was the "result of the misconduct conviction."   (Doc. 20, Am. Compl., at 8.)   Vernon thus has acknowledged that he was barred from visiting with his wife after he was convicted of violating prison rules, and it appears that this violation may be involved his receipt

of contraband from visitors, including his wife.  Nothing in the earlier iteration of Vernon's amended complaint supports Vernon's allegations that his loss of visitation privileges was retaliation for his exercise of constitutionally protected conduct. Rather, that transfer seems reasonably calculated to reduce future opportunities to institutional misconduct and contraband smuggling by Vernon.

We also find that Vernon has failed to allege plausible facts to show that the Secretary of the Department of Corrections, and the Superintendent of SCI-Coal Township, jointly engaged in unlawful retaliation by ordering Vernon transferred to SCI-Greene.  Although Vernon has alleged that this transfer occurred very shortly after his grievances were exhausted, he has alleged no other facts to plausibly connect his transfer – which followed his conviction for serious prison infractions – to what he earlier described as his "supplications for recourse from [prison officials] to rectify the malfeasance of Defendant Kerns-Barr".  (Doc. 20, Am. Compl., at 16 ¶ 70.) Vernon's allegations in each of his complaints regarding his transfer are summary and conclusory, and lack adequate factual allegations to support them as the predicate for a retaliation claim.

Additionally, to the extent that Vernon is now attempting to claim that he was issued a misconduct for refusing to provide information about other inmates, the claim fails.  To the extent that Vernon's alleged refusal is, in fact, protected activity,

it is undisputed that Vernon was found guilty of the misconduct charges and the finding of guilt was upheld at every level of review. As a result, the finding of guilt on the misconduct effectively bars Vernon from now claiming that the misconduct was issued for retaliatory purposes, since the finding of guilt constitutes some evidence that the allegedly retaliatory action would have occurred regardless of whether Vernon had engaged in protected conduct, and therefore forecloses the retaliation claim. See e.g., Nifas v. Beard, 374 F. App'x 241, 244 (3d Cir. 2010); see also Henderson v. Baird, 29 F.3d 464, 469 (8th Cir. 1994) (stating that a finding of "some evidence" to support a prison disciplinary determination "checkmates" the prisoner's retaliation claim).

In short, Vernon has not alleged facts in the amended complaint sufficient to articulate a retaliation claim, regardless of whether that claim is based upon a misconduct that he was issued by defendant Shipe, or on his transfer to SCI-Greene. Vernon's conviction for this misconduct, which involved contraband smuggling by family members, effectively checkmates this conclusory retaliation claim. Moreover, Vernon has not alleged well-pleaded facts which would permit an inference that these actions were causally related to his act of writing to the Superintendent at SCI-Coal Township, or to the letters he claims to have sent to the Secretary of the Department of Corrections complaining about what he perceived were flawed misconduct

proceedings. Instead, these actions seem to be a result of Vernon's institutional misconduct. We have endeavored to give Vernon ample opportunity to articulate facts to support his retaliation claim, but this has proved unavailing. Because Vernon's latest amended pleading still fails to include sufficient factual allegations, Vernon's First Amendment retaliation claim will also be dismissed.

### C. Vernon's Claims Against the Supervisory Defendants Must Be Dismissed

In addition to these substantive shortcomings, we note that Vernon's amended complaint purports to bring claims against defendants Wetzel, Lewis, Varano, Luscavage, Miller, Chismar, and Custer based upon their roles as supervisors responsible for the actions of their subordinates. Vernon may also be suing these defendants for their allegedly unfavorable responses to his complaints about their roles in his administrative appeals process. Whatever his theory, Vernon's claims against these supervisory officials fail.

Section 1983 of Title 42 of the United States Code provides private citizens with a means to redress violations of federal law committed by state officials. See 42 U.S.C. § 1983. The statute provides, in relevant part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any

> rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress . . . .

Id. Section 1983 is not itself a source of substantive rights, but is rather a vehicle for

vindicating violations of other federal laws. Gonzaga Univ. v. Doe, 536 U.S. 273,

284-85 (2002); Kopec v. Tate, 361 F.3d 772, 775-76 (3d Cir. 2004).  In order to

establish a claim under this section, a plaintiff must show that a deprivation of a

"right secured by the Constitution and laws of the United States . . . . by a person

acting under color of state law." Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir.

1996) (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).

In claims brought under 42 U.S.C. § 1983, it is axiomatic that "[an individual

government] defendant in a civil rights action must have personal involvement in the

alleged wrongdoing; liability cannot be predicated solely on the operation of

*respondeat superior*.  Personal involvement can be shown through allegations of

personal direction or of actual knowledge and acquiescence." Evancho v. Fisher, 423

F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d

Cir. 1988)); see also Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997).

Furthermore, allegations of actual knowledge and acquiescence must be shown with

"appropriate particularity." Mincy v. Chmielsewski,, No. 12-1996, 2013 WL 49765,

at *4 (3d Cir. Jan. 4, 2013) (slip op.).  Thus, relief cannot be granted against a

defendant pursuant to § 1983 based solely on a *respondeat superior* theory or the fact that the defendant was a supervisor or superior of the person whose conduct actually deprived the plaintiff of a federally protected civil right.  Rouse v. Plantier, 182 F.3d 192, 200  (3d Cir. 1999).

Vernon's allegations that the supervisory defendants somehow violated his rights merely because they supervised other defendants, or because they allegedly failed to properly address his written complaints and appeals, without more, is insufficient to show personal involvement by this prison official absent some other evidence that these defendants personally engaged in retaliatory conduct or violated Vernon's right to due process.  See Rode, 845 F.2d at 1208 (holding that the filing of a grievance is not enough to show the actual knowledge necessary for personal involvement); see also Brooks v. Beard, 167 F. App'x 923, 925 (3d Cir. 2006) (state prisoner's allegation that prison officials and administrators responded inappropriately, or failed to respond to a prison grievance, did not establish that the officials and administrators were personally involved in the allegedly unconstitutional conduct); Burnside v. Moser, 138 F. App'x 414, 416 (3d Cir. 2005) (failure of prison official to process administrative grievance did not amount to a constitutional violation or personal involvement in the alleged constitutional deprivation grieved). In this regard, the United States Court of Appeals for the Third Circuit has observed

when disposing of a similar claim by another inmate that a district court may: "properly dismiss[] . . . defendants who were sued based on their failure to take corrective action when grievances or investigations were referred to them. <u>See Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir.1988) (defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior* ); <u>see also Antonelli v. Sheahan</u>, 81 F.3d 1422, 1430 (7th Cir.1996) (state's inmate grievance procedures do not give rise to a liberty interest protected by the Due Process Clause)." <u>Pressley v. Beard</u>, 266 F. App'x 216, 218 (3d Cir. 2008). Indeed, as to such claims, the United States Court of Appeals for the Third Circuit has recently held that summary dismissal is appropriate "because there is no apparent obligation for prison officials to investigate prison grievances. <u>See Inmates of Attica Corr. Facility v. Rockefeller</u>, 477 F.2d 375, 382 (2d Cir.1973)." <u>Paluch v. Sec'y Pennsylvania Dept. Corr.</u>, 442 F. App'x 690, 695 (3d Cir. 2011).

Thus, Vernon has simply not articulated facts to show that any of these supervisory defendants committed actionable violations of his constitutional rights.

### D.     Vernon's State Tort Claims Must Be Dismissed

In addition to his federal claims brought under 42 U.S.C. § 1983, Vernon may be continuing his efforts to articulate state-law tort claims against the individual

defendants for what he alleges was intentional misconduct on their part, based upon the same general course of conduct upon which he based his constitutional claims. As explained below, to the extent Vernon is continuing to press these claims, they fail as a matter of law because state law expressly bars them.

Under Pennsylvania law, the Commonwealth, its agencies and employees enjoy broad immunity from most state-law tort claims, as the General Assembly has by statute provided that "the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity." 1 Pa. Cons. Stat. Ann. § 2310; see also Moore v. Commonwealth, 538 A.2d 111, 115 (Pa. Commw. Ct. 1988) ("In other words, if the Commonwealth is entitled to sovereign immunity under Act 152, then its officials and employees acting within the scope of their duties are likewise immune."). This grant of immunity "applies to Commonwealth employees in both their official and individual capacities, so long as the employees are 'acting within the scope of their duties.'" Larsen v. State Employees' Ret. Sys., 553 F. Supp. 2d 403, 420 (M.D. Pa. 2008). Conduct of an employee is within the scope of employment if " 'it is of a kind and nature that the employee is employed to perform; [and] it occurs substantially within the authorized time and space limits . . . .' " Brautigan v. Fraley, No. 09-1723,

28

2010 WL 480856, *4 (M.D. Pa. Feb. 4, 2010) (Rambo, J.).

In this case, the defendants contend that they are each Commonwealth employees or officials, who were acting within the scope of their employment in committing each of the acts alleged in this case, which are limited to Vernon's complaints about his misconduct proceedings, his housing, his transfer, and restrictions on his visitation privileges. The allegations in the amended complaint support the defendants' contention.

The defendants also contend that none of the nine recognized exceptions to sovereign immunity apply here. In 42 Pa. Cons. Stat. Ann. § 8522(b), the General Assembly defined nine separate, narrow exceptions to the broad grant of sovereign immunity. These exceptions include: (1) vehicle liability; (2) medical-professional liability; (3) care, custody or control of personal property; (4) Commonwealth real estate, highways and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines. "Because of the clear intent to insulate government from exposure to tort liability, the exceptions to immunity are to be strictly construed." Lockwood v. City of Pittsburgh, 751 A.2d 1136, 1139 (Pa. 2000) (citation omitted). Based on fair reading of the amended complaint, it is clear that none of these exceptions has application in this case.

Given the broad grant of immunity provided by Pennsylvania law, and mindful of the narrow scope and application of the nine limited exceptions to sovereign immunity that plainly do not apply to the conduct alleged in this case, which involve the defendants' acts and decisions made in the scope of their duties with the Department of Corrections, we conclude that the defendants in this case are immune from Vernon's state-law tort claims, and these claims must be dismissed.

## V.   <u>CONCLUSION</u>

For all of the foregoing reasons, we find that Vernon's amended complaint fails to state a claim upon which relief can be granted and must be dismissed.

In civil rights cases *pro se* plaintiffs often should be afforded an opportunity to amend a complaint before the complaint is dismissed in its entirety, <u>See</u> <u>Fletcher-Hardee Corp. v. Pote Concrete Contractors</u>, 482 F.3d 247, 253 (3d Cir. 2007), unless granting further leave to amend would be futile or result in undue delay. <u>Alston v. Parker</u>, 363 F.3d 229, 235 (3d Cir. 2004).  In this case, Vernon has now filed four complaints (Docs. 1, 10, 20, 38), and we find that despite having been given ample time and opportunity to allege facts to support his claims, he has been unable to do so.  We now find that the defendants are entitled to have Vernon's claims dismissed with prejudice.

An appropriate order dismissing this action with prejudice will be entered

separately.

/s/ Martin C. Carlson
Martin C. Carlson
United States Magistrate Judge

Date: May 7, 2014